IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | 8:17CR290 |
| vs. | **AMENDED FINDINGS AND RECOMMENDATION** |
| ANTHONY D. GORDON, | |
| Defendant. | |

This matter is before the Court on the Defendant's Amended Motion to Suppress (Filing No. 20). While Defendant did not file a brief in support of the motion as required by the Criminal Rules of the United States District Court for the District of Nebraska, see NECrimR 12.3(b)(1), Defendant's argument was contained in his motion and will be accepted by the Court in this instance in satisfaction of the Rule's requirement. The government filed a brief (Filing No. 25) opposing the motion.

The Court held an evidentiary hearing on the motion on December 19, 2017. Defendant was present with his attorney, Jackie L. Barfield. The government was represented by Assistant United States Attorney, Susan Lehr. Omaha Police Department Sergeant Timothy Woolman ("Sgt. Woolman") and Omaha Police Department Officer Martin Obrecht ("Ofc. Obrecht") testified on behalf of the government. The Court received into evidence, without objection, a Google Aerial Map of 24th and Ames Ave. (Exhibit 1) and a copy of Neb. Rev. Stat. § 60-6,193[1] (Exhibit 2) offered by the government. Defendant did not call any witnesses or offer other evidence. A transcript (TR.) of the hearing was prepared and filed on December 26, 2017. (Filing No. 35). The matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that the motion be denied.

## BACKGROUND

Sgt. Woolman has been employed by the Omaha Police Department for nineteen years, the last thirteen as a Sergeant. His regular shift is 3:00 p.m. to 11:00 p.m., but on August 4, 2017, he was working the 6:00 p.m. to 3:00 a.m. shift for the "Native Omaha Days" event in

---

[1] The Court also took judicial notice of this statute, without objection.

North Omaha. (TR. 5-6). Ofc. Obrecht has been employed by the Omaha Police Department for eight years and was assigned as Sgt. Woolman's partner for the shift. (TR. 35). Sgt. Woolman described the event as a "huge block party" that occurs every two years in the general area of 24th Street between Ames and Hamilton Streets, and requires a greater law enforcement presence due to the large number of people in attendance and prior incidents of fighting, drinking, shootings, and gun seizures. (TR. 6-7).

At about 12:08 a.m., Sgt. Woolman was driving a marked cruiser with Ofc. Obrecht in "zone one," which is the farthest north zone of the event. Part of the officers' responsibilities in patrolling this zone is to check on the Los Diablos Motorcycle Club on 25th and Ames. Exhibit 1 is an aerial map of this area. (TR. 8-10). As Sgt. Woolman drove past the motorcycle club eastbound on Taylor Street, the officers noticed a Chevy Impala stopped just west of 24th Street in the eastbound lane, approximately five feet away from the curb. (TR. 10, 25, 33, 35, 39). Sgt. Woolman observed that at least two other vehicles had to drive around the Impala in the westbound lanes to access 24th Street. (TR. 11). The officers did not know if the Impala was stalled, if there was an accident, or if the driver was suffering from a medical condition. (TR. 11, 37).

Sgt. Woolman and Ofc. Obrecht stopped their cruiser behind the Impala and activated the cruiser's overhead lights and spotlights, but did not activate the siren. Sgt. Woolman approached the driver's side and Ofc. Obrecht approached the passenger side of the Impala. The Impala was in park with its engine running. (TR. 11-13, 19-20, 37). Sgt. Woolman observed a black male, later identified as Defendant, in the driver's seat of the Impala. (TR. 16-17). As Defendant was talking on his phone and apparently unaware of the police presence, Sgt. Woolman knocked on the window to get Defendant's attention. (TR. 14, 38). Sgt. Woolman noticed that Defendant's eyes were bloodshot and watery, Defendant was speaking loudly on the phone with slurred speech, and Defendant appeared to be impaired. (TR. 13-14). Ofc. Obrecht likewise testified that Defendant showed signs of impairment. (TR. 38-39).

Sgt. Woolman asked Defendant to hang up the phone and step out of the vehicle. Sgt. Woolman testified that his focus was on Defendant's hands and feet when Defendant initially stepped out of the vehicle. (TR. 31). Sgt. Woolman indicated to Ofc. Obrecht that they were going to administer field sobriety tests. Ofc. Obrecht walked to the rear of the Impala, and Sgt.

2

Woolman walked Defendant to Ofc. Obrecht to administer the field sobriety tests. (TR. 14-15, 17, 39, 50). The officers did not pat down Defendant. (TR. 51).

Sgt. Woolman left Defendant with Ofc. Obrecht and returned to the driver side of the Impala to look for paperwork.[2] Ofc. Obrecht remained with Defendant making small talk to attempt to build a rapport. (TR. 42). Sgt. Woolman testified that as soon as he returned to the Impala, he saw a gun on the driver's seat. Sgt. Woolman testified he did not enter the Impala but saw the firearm through the driver's door, which was left open when Defendant exited. Sgt. Woolman immediately informed Ofc. Obrecht that he found a firearm, and Ofc. Obrecht handcuffed Defendant for purposes of officer safety because they did not know whether other firearms were present. (TR. 15-16, 28-29, 41-42). Sgt. Woolman testified that the firearm had been concealed because he did not initially see it when Defendant stepped out of his vehicle. (TR. 16). Sgt. Woolman described the firearm as an older silver revolver with a pearl handle and having a serial number. (TR. 30). Sgt. Woolman did not see any other persons approach the vehicle during the encounter. (TR. 16). According to Sgt. Woolman, he did not ask the Defendant any questions, but Defendant "blurted out" that it was not his gun and that he did not know how it got there. (TR. 17, 44).

As soon as Sgt. Woolman found the firearm, he requested additional units and someone with a Preliminary Breath Test. (TR. 17). The officers did not conduct field sobriety tests on the scene due to officer safety concerns once they found the firearm. (TR. 18, 43). Because the Impala's license plates indicated it was registered to a female, officers searched for paperwork in the vehicle.[3] Backup officers performed a data check to see if Defendant was a convicted felon and also searched the vehicle incident to a lawful arrest for possession of a concealed handgun. (TR. 18-19). The data check showed Defendant had at least one prior felony conviction. (TR. 19, 44). Defendant was arrested on a number of charges, including impeding traffic, no valid registration, no proof of insurance, DUI, felon in possession of a firearm, unlawful carrying, and unregistered firearm. (TR. 32). Defendant was transported to Central Headquarters where the DUI investigation was processed. Defendant was given his *Miranda* warnings and invoked his

---

[2] On cross-examination, Sgt. Woolman indicated that he went back to Defendant's vehicle to look at what was inside it. (TR. 26).

[3] The officers did find paperwork indicating Defendant purchased the vehicle in June, but had left on the plates from the prior owner. (TR. 18).

right to remain silent. Officers asked no questions regarding the firearm and Defendant made no statements regarding the firearm. (TR. 45).

On Sgt. Woolman's cross-examination, he testified that he could have asked Defendant to roll the window down to perform some field sobriety tests, including a horizontal gaze nystagmus test, an alphabet test, and a counting test. (TR. 21). Nonetheless, Sgt. Woolman testified that he believed he had enough information to ask Defendant to step out of the car. (TR. 22). Sgt. Woolman agreed there could be a number of reasons besides intoxication why a person's eyes could be glazed and their speech slurred, including drugs. (TR. 23). Sgt. Woolman testified that there was no recording equipment in his cruiser, nor on either his or Ofc. Obrecht's person. (TR. 29).

On Ofc. Obrecht's cross-examination, he testified that the area was somewhat lit from the cruiser's lights, a nearby business, and a streetlight. (TR. 46). Ofc. Obrecht could see inside the Impala, but did not see the firearm on the driver's seat. (TR. 46-47). At some point after Sgt. Woolman found the firearm, Ofc. Obrecht returned to the Impala to get a bill of sale. (TR. 47). Ofc. Obrecht intended to conduct field sobriety tests before Sgt. Woolman discovered the firearm. (TR. 49). Ofc. Obrecht testified that he did not ask for Defendant's consent to search the Impala. (TR. 49).

Defendant seeks suppression of "any physical evidence as the result of his unlawful seizure." He argues that he was unlawfully arrested and searched without a warrant. ([Filing No. 20 at p. 1](#)). Defendant also seeks suppression of any statements he made to law enforcement subsequent to his illegal arrest. ([Filing No. 20 at p. 3](#)).

## ANALYSIS

Defendant asserts that there is no evidence that a motor vehicle violation precipitated the officers' stop of Defendant's vehicle. ([Filing No. 20 at p. 1](#)). Initially, the undersigned magistrate judge disagrees with Defendant's position that the officers' initial contact with Defendant's vehicle amounted to a seizure under the Fourth Amendment. The officers merely approached Defendant's vehicle, which was already stopped in the middle of a public street in the eastbound lane of traffic, and knocked on his window. See, e.g., *[United States v. Barry](#)*, 394 F.3d 1070, 1075 (8th Cir. 2005)(concluding the officer's conduct in approaching defendant's parked vehicle in an alley late at night, parking the patrol car approximately 15 feet away, and

knocking on the window of defendant's vehicle did not amount to a show of authority such that a reasonable person would believe he was seized).

Nevertheless, the officers also had probable cause to stop the Defendant for the traffic offense of impeding traffic. "Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Adler*, 590 F.3d 581, 583 (8th Cir. 2009)(quoting *United States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008)). Under Nebraska law, "No person shall drive a motor vehicle at such a slow speed as to impede the normal and reasonable movement of traffic except when reduced speed is necessary for safe operation in compliance with law." Neb. Rev. Stat. § 60-6,193(1). Both officers testified that when they first observed Defendant's vehicle, it was stopped in the eastbound lane of traffic approximately five feet from the curb. Sgt. Woolman observed that two vehicles had to drive in the westbound lane to get around Defendant's stopped vehicle. Therefore, the officers had probable cause to stop Defendant to investigate the traffic violation of impeding traffic.

As soon as the officers made contact with Defendant, they observed Defendant was speaking loudly and with slurred speech, and his eyes were bloodshot and watery. These observations, combined with the fact that Defendant's vehicle was parked but still running in the middle of the eastbound lane of traffic after midnight during a block party event known to have increased alcohol consumption, gave rise to reasonable suspicion to investigate whether Defendant was driving under the influence. See, e.g., *United States v. Houston*, 548 F.3d 1151, 1154 (8th Cir. 2008). Additionally, during a lawful traffic stop, the Fourth Amendment permits an officer to check the driver's identification and vehicle registration and ask the driver to step out of the vehicle. See *United States v. Gregory*, 302 F.3d 805, 809 (8th Cir. 2002)("The Fourth Amendment grants an officer conducting a routine traffic stop latitude to check the driver's identification and vehicle registration, [and] ask the driver to step out of his vehicle and over to the patrol car[.]"). Under the circumstances of this case, the Fourth Amendment permitted the officers to ask Defendant to step out of his vehicle to administer field sobriety tests as part of their investigation to confirm or dispel their suspicions that he was driving under the influence.

As part of the DUI investigation, Sgt. Woolman walked Defendant to Ofc. Obrecht to conduct sobriety tests. Upon returning to the Impala, Sgt. Woolman observed a firearm on the driver's seat, which he had not seen initially. Ofc. Obrecht's handcuffing of Defendant after Sgt. Woolman's discovery of the firearm was a reasonable precaution for officer safety and did not

5

convert Defendant's detention into an arrest. See, e.g., *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006)(considering that handcuffing the defendant during a *Terry* stop was a reasonable precaution to protect an officer's safety and did not convert the stop into an arrest).

Sgt. Woolman's subsequent warrantless seizure of the firearm was constitutionally permissible under the plain view doctrine. "[A]n officer, without a warrant, may seize an object in plain view provided the officer is lawfully in the position from which he or she views the object, the object's incriminating character is immediately apparent, and the officer has a lawful right to access the object." *United States v. Bynum*, 508 F.3d 1134, 1137 (8th Cir. 2007). Sgt. Woolman was in a lawful position to view the firearm. See *id.* (citing *United States v. Beatty*, 170 F.3d 811, 814 (8th Cir. 1999)("Neither probable cause nor reasonable suspicion is necessary for an officer to look through a window (or open door) of a vehicle so long as he or she has a right to be in close proximity to the vehicle."). The incriminatory nature of the firearm was immediately apparent as "[h]idden guns, even badly hidden guns, are by their nature incriminating," and Nebraska law prohibits carrying concealed weapons. *United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995); Neb. Rev. Stat. § 28-1202(1)(a). Therefore, Sgt. Woolman's seizure of the firearm, without a warrant, was permissible pursuant to the plain view exception to the Fourth Amendment.

Defendant's warrantless arrest was also permissible under the Fourth Amendment. "A warrantless arrest by law enforcement is reasonable where there is probable cause to believe that someone has committed or is committing a crime." *United States v. Winarske*, 715 F.3d 1063, 1066 (8th Cir. 2013) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). The officers' data check on the scene showed that Defendant had at least one prior felony conviction. The firearm was found in Defendant's vehicle in the driver's seat where he had been sitting, and the officers did not observe any other individuals approach the vehicle during the encounter. Therefore, at a minimum, probable cause existed for Defendant's warrantless arrest for being a felon in possession of a firearm.

Finally, Defendant argues "any statements [Defendant] made subsequent to the police illegally searching him and seizing him must be suppressed." (Filing No. 20 at p. 3). As discussed above, Defendant's warrantless arrest was constitutionally permissible. Moreover, Ofc. Obrecht testified that Defendant was provided with *Miranda* warnings and invoked his right to remain silent. Officers asked no questions regarding the firearm and Defendant made no

statements. To the extent Defendant seeks suppression of his statement on the scene that it was not his gun, such statement was spontaneously made by Defendant and not the product of an illegal arrest or custodial interrogation. Defendant was not in custody at the time he made the statement, nor was his statement made in response to any question asked of him by the officers. See, e.g., *United States v. McGlothen*, 556 F.3d 698, 700-01 (8th Cir. 2009)(holding a defendant's spontaneous, incriminating statement, not in response to interrogation, was admissible). For the foregoing reasons,

**IT IS HEREBY RECOMMENDED** to District Judge Robert F. Rossiter that Defendant's Amended Motion to Suppress (Filing No. 20) be denied.

Dated this 5th day of January, 2018.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

### ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.